**IT IS ORDERED as set forth below:**

**Date: September 6, 2018**

_____

**Jeffery W. Cavender
U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF: | : | BANKRUPTCY CASE |
| | : | NO. 17-53487-JWC |
| **ALLYSON RENEA CLARK,** | : | |
| Debtor. | : | CHAPTER 7 |
| ............................................................................ | : | |
| | : | ADVERSARY PROCEEDING |
| **PANAWE BATANADO,** | : | NO. 17-5147 |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| **ALLYSON RENEA CLARK,** | : | |
| Defendant, | : | |
| ............................................................................ | : | |
| | : | |
| **ALLYSON RENEA CLARK,** | : | |
| Counter-Claimant, | : | |
| v. | : | |
| | : | |
| **PANAWE BATANADO,** | : | |
| Counter-Defendant. | : | |

1

**MEMORANDUM OPINION**

This matter came before the Court upon the Complaint Objecting to and Seeking to Determine Dischargeability of Debt filed by Panawe Batanado ("Plaintiff") in the above-captioned matter. At the conclusion of the trial conducted on August 1, 2018, the Court took this matter under advisement. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The claim of Plaintiff and the counterclaims of Defendant Allyson Renea Clark ("Defendant") constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(C) and (J).[1] Upon consideration of the testimony and documentary evidence admitted, arguments presented by the parties, the pleadings submitted and the record in this case, the Court makes the following findings of fact and conclusions of law:

**I.   Procedural History**

Defendant filed a petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on February 27, 2017. Plaintiff commenced this adversary proceeding on June 1, 2017 by filing a complaint seeking to determine the dischargeability of a debt allegedly due from Defendant. Plaintiff alleges that he engaged in an ongoing sexual relationship with Defendant that lasted more than eight years. During that period, Plaintiff contends Defendant represented to Plaintiff that she was neither married nor engaged in a sexual relationship with a party other than Plaintiff. Notwithstanding such representations, Plaintiff asserts that Defendant was actually married to and engaged in a sexual relationship with another man throughout most of their eight-year relationship. In May of 2013, with full knowledge that she was married to another

---

[1] Before the trial in this matter commenced, the Court confirmed with both parties on the record that they had no objection to the Court's jurisdiction to hear and determine all matters raised by Plaintiff and Defendant in this action.

2

man, Plaintiff contends that Defendant informed him that she was two months pregnant with Plaintiff's child and failed to disclose any question or qualification as to the potential paternity of the unborn child. Plaintiff asserts that Defendant falsely and fraudulently told him that he was the father of the child and demanded and received money from Plaintiff for support and expenses of the child on the basis that he was the child's father. The following year, Plaintiff alleges Defendant represented that she was pregnant with Plaintiff's second child without disclosing that she was engaged in a sexual relationship with another party and without disclosing any question or qualification as to the potential paternity of the second child. Plaintiff brings a claim under 11 U.S.C. § 523(a)(2)(A) alleging that Defendant "perpetuated a fraud on Plaintiff by knowingly making false and fraudulent statements to Plaintiff concerning Plaintiff's paternity of the children that Defendant knew were false at the time that Defendant made the statements." Compl. ¶ 56 [Adversary Docket No. 1]. Through actual fraud, false pretenses and/or false representations as to Plaintiff's purported paternity of both children, Plaintiff asserts that Defendant intentionally induced Plaintiff to provide Defendant in excess of $25,000, which should be excepted from Defendant's discharge in her chapter 7 bankruptcy proceeding.

In response to the Complaint, Defendant asserts that Plaintiff misrepresented his marital status to Defendant from the outset of their relationship. She further contends that she never represented to Plaintiff that he was the father of her children. Instead, Defendant contends Plaintiff assumed as much based on their "on again, off again" sexual relationship over an eight-year period. Given that she was sexually active with more than one person during the period of time in which each of the two children were conceived, Defendant asserts that she did not know who the father of either child was and therefore could not have falsely represented their paternity to Plaintiff. Additionally, Defendant contends that any money paid by Plaintiff to Defendant was not child

3

support but instead represented an allowance so that Defendant would continue the sexual relationship with Plaintiff and for child care so that Defendant was free to meet with Plaintiff. Defendant asserts that Plaintiff is barred from recovering any amounts from Defendant due to his own unclean hands.  Facts that Defendant contends support her unclean hands defense include, among other things, Plaintiff's marital status, his alleged commission of the crime of adultery under Georgia law and Plaintiff paying Defendant an "allowance" to continue their sexual relationship notwithstanding his marriage to another woman.  Defendant also asserts counterclaims for fraud and intentional infliction of emotional distress against Plaintiff.  Defendant contends that Plaintiff misrepresented his marital status to Defendant at the outset of their relationship and seduced Defendant into a destructive eight-year relationship for which she suffered damages, including, but not limited to, having multiple abortions, severe anxiety, loss of self-esteem and diagnosed depression.  Plaintiff disputes Defendant's unclean hands defense and denies any liability to Defendant on her counterclaims.  On August 1, 2018, the Court conducted a full-day trial on the claims, defenses and counterclaims.

**II.    Findings of Fact**

This sordid story began in or around July of 2008 when Plaintiff, who is originally from Togo, West Africa, posted his profile on eHarmony.com seeking connections to date women. Shortly after connecting on the site, Plaintiff and Defendant went on a number of dates, and their relationship quickly became sexual in nature.  During this early period, Defendant accompanied Plaintiff on business trips to Los Angeles and Boston, and Plaintiff frequently provided gifts or money in various amounts to Defendant.  As quickly as the relationship started, it just as quickly came to what would become the first of many ends in November of 2008, when Defendant

discovered she was pregnant. Defendant testified that Plaintiff demanded that she have an abortion, which led to a breakdown in their relationship.

After the breakup, Plaintiff traveled to Togo in December of 2008 and did not return to Atlanta until January of 2009. While Plaintiff was in Togo, Defendant married another man with whom she had been friends for many years (the "First Husband"). Defendant realized soon thereafter that the marriage was a mistake and commenced divorce proceedings to end the marriage. Plaintiff was unaware of Defendant's marriage to the First Husband. Upon his return to Atlanta in January of 2009, Plaintiff paid for Defendant to have an abortion and accompanied Defendant to the procedure. It was also in or around this same period that Defendant discovered that Plaintiff was married to another woman and had a child.[2] Upon Defendant's discovery of the marriage, Plaintiff told Defendant he was unhappy in his marriage and proposed to continue a relationship with Defendant. Some form of relationship continued for a few additional months but broke off again around May of 2009. Around the same time, Defendant began dating and soon married another man (the "Second Husband"). The marriage to her Second Husband occurred in June of 2009. Shortly thereafter, Defendant discovered that her divorce from her First Husband was not final and did not become final until August 3, 2009. Upon informing her Second Husband that they were not legally married, Defendant testified that they broke off their relationship.

In August of 2009, Plaintiff and Defendant reconnected and began seeing each other again and would continue the pattern of an "on again, off again" relationship over the next several years.

---

[2] Defendant has offered conflicting answers as to when she discovered Plaintiff was married. At trial she testified that she first discovered Plaintiff was married in December of 2008 by searching his computer after Plaintiff demanded she have an abortion. Her discovery responses confirmed the December 2008 timeframe, but her Answer to the Complaint alleged that she found out Plaintiff was married in or about September of 2009. Defendant testified at trial that the September 2009 date was when she found out his wife was pregnant and had already delivered a second child.

5

Defendant testified that during this time frame, Plaintiff repeatedly made representations to her that he was going to leave his wife so that they could start a family together. Plaintiff testified that he did in fact intend at some point to leave his wife but that he was waiting for the right time—after his wife, who had moved from Togo in 2012, finished school and could live on her own.[3]

In or around May of 2013, Defendant called Plaintiff crying and saying that she was pregnant again. Plaintiff testified that she told him he was the father of the child, a fact which Defendant disputes. Defendant testified that she never told Plaintiff he was the father of the child; rather, he simply assumed as much given their ongoing sexual relationship. In December of 2013, Defendant gave birth to a son. Plaintiff was not invited to the birth of the child, purportedly because Defendant's mother did not like him. Unbeknownst to Plaintiff, Defendant's Second Husband attended the birth and was named as the father on the birth certificate. Defendant gave birth to a daughter the following year, in November of 2014. Plaintiff asserts that Defendant represented he was the father of the second child, which Defendant disputes. Plaintiff again was not invited to the birth, and again unbeknownst to Plaintiff, Defendant's Second Husband was named as the father on the birth certificate. Plaintiff had no role in naming either child.

Throughout their "on again, off again" relationship, Plaintiff provided money and support to Defendant. Plaintiff testified that after the birth of both children, his financial support to Defendant increased substantially because, as he contends, he was falsely led to believe he was the father of both children. Defendant, on the other hand, contends that the money paid to her by Plaintiff was not child support for the kids but instead was an agreed upon $500 per month allowance, which Plaintiff proposed to provide to her so that she would continue in a sexual relationship with him. Defendant testified Plaintiff first proposed this "allowance" arrangement

---

[3] At the time of the trial, Plaintiff was still married to, and living with, his wife.

6

in February of 2009 and that Plaintiff agreed to provide more money as needed. The evidence of financial contributions offered at trial, however, clearly supports Plaintiff's version of events. Plaintiff offered substantial evidence of the financial support he provided to Defendant since the middle of 2010.[4]  That evidence shows a clear and substantial increase in payments to Defendant after the children were born. Moreover, the evidence submitted relative to payments received by Defendant simply does not support Defendant's claim of a $500 monthly allowance.

After the births of both children, Plaintiff had limited access to the children, only seeing them once every couple of months at most. Plaintiff never visited with them in Defendant's home and never knew where they actually lived. Knowing that he could not expect Defendant to be in an exclusive relationship with him given his own marital status, Plaintiff had suspicions early on as to whether he was the father of either child. In light of those suspicions, he would ask every few months to see copies of the children's birth certificates, and he was continually rebuffed by Defendant in his efforts to see the birth certificates. Plaintiff admitted that clues existed throughout the time that he was paying support for the benefit of the children that he was not their father, and he testified that he feels guilty that he did not press on those clues. He also testified that he knew something was strange in the whole situation, but he trusted Defendant and did not ask for a paternity test.

By June of 2016, however, Plaintiff's suspicions got the best of him, and he decided to drive to where he thought Defendant lived to hash out their ongoing issues. When he arrived at where he believed Defendant lived, he found no residence. That discovery prompted him to use an online private investigation application which revealed within 30 minutes the following:

---

[4] The testimony was uncontroverted that financial support started earlier, but bank records could not be obtained back to the start of their relationship.

Defendant's prior marriages to her First Husband and her Second Husband; Facebook pages of her Second Husband showing pictures of his marriage to Defendant; Facebook pages showing pictures of her Second Husband with his two children—the same children Plaintiff believed were his own; Facebook pages from Defendant's mother congratulating Defendant and her Second Husband on the fourth anniversary of their marriage; Facebook pages of her Second Husband showing a date night with his wife (Defendant) in January of 2016; and a Facebook page of Defendant where she uses the last name of her Second Husband.

Shocked by what he discovered, Plaintiff confronted Defendant in a series of text messages throughout the day and shortly thereafter advised Defendant that he was going to get a lawyer to get the money back that she scammed from him by letting him believe he was the father of her two children. Notwithstanding the initial shock and threats, and his discovery that many things he believed about Defendant and the children were false, Plaintiff continued to have an ongoing relationship with Defendant for several more months. During this time period he even indicated in a text message exchange that if both kids proved not to be his, he still had an interest in having kids with her in the future. Ultimately, DNA testing confirmed a zero percent probability that Plaintiff was the father of either child. Their relationship ended in or around the same time, and Plaintiff commenced litigation in state court against Defendant soon thereafter seeking recovery of money he paid Defendant in support of the children.[5]

### III. Conclusions of Law

Upon the above facts, the Court is tasked with determining four primary issues: (i) whether Plaintiff met his burden of establishing that Defendant obtained money or property from him by false pretenses, false representations or actual fraud such that any debt owed by

---

[5] The state court litigation was stayed upon commencement of the underlying bankruptcy case.

8

Defendant to Plaintiff should be excepted from her discharge under 11 U.S.C. § 523(a)(2)(A); (ii) whether Plaintiff is barred from recovering on his claim based on his own unclean hands; (iii) whether Defendant met her burden of establishing Plaintiff is liable to her on her counterclaim for fraud; and (iv) whether Defendant met her burden of establishing Plaintiff is liable to her on her counterclaim for intentional infliction of emotional distress. The Court addresses each of those issues in the order presented.

### A. §523(a)(2)(A) False Pretenses, False Representation or Actual Fraud

The Court must begin any analysis of whether an exception to discharge exists with the fundamental understanding that a debtor's ability to receive a fresh start is one of the most important and powerful benefits of bankruptcy. As a result, courts generally construe exceptions to discharge narrowly against the objecting creditor and in favor of the debtor. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994) (citations omitted); *Hathaway v. OSB Mfg., Inc. (In re Hathaway)*, 364 B.R. 220, 231 (Bankr. E.D. Va. 2007) (citations omitted). The Court, however, "must strike a balance between protecting a debtor's fresh start and the principle that 'perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code.'" *Hathaway*, 362 B.R. at 231 (quoting *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999)). The exception at issue in this case arises under § 523(a)(2)(A) of the Bankruptcy Code, which makes debts non-dischargeable:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by ---
> (A) false pretenses, a false representation, or actual fraud….

11 U.S.C. § 523(a)(2)(A). At a trial on a complaint to determine the dischargeability of a debt, the plaintiff bears the burden of proving the debt is non-dischargeable by a preponderance of the evidence. Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112

L.Ed.2d 755, 767 (1991).  This Court thus must analyze whether Plaintiff carried his evidentiary burden in this case.

To obtain relief under Section 523(a)(2)(A), Plaintiff must show by a preponderance of the evidence that Defendant obtained money, property or credit from Plaintiff:  (1) by false representation, pretense or fraud; (2) knowingly made or committed; (3) with the intent to deceive or induce acting on the same; (4) upon which Plaintiff actually and justifiably relied; and (5) from which Plaintiff suffered damages, injury or loss as a proximate result.  *Washington v. Robinson-Vinegar (In re Robinson-Vinegar)*, 561 B.R. 562 (Bankr. N.D. Ga. 2016); *Blosser v. Boggus (In re Boggus)*, 479 B.R. 147, 154 (Bankr. N.D. Ga. 2012); *HSSM #7 Ltd. P'ship. v. Bilzerian (In re Bilzerian)*, 100 F.3d 886, 892 (11th Cir. 1996).

### 1. False Representation, Pretense or Fraud

The first element focuses on whether Defendant made false representations or pretenses or committed actual fraud against Plaintiff.  Here, Plaintiff claims Defendant falsely represented that he was the father of the two children.  Defendant, on the other hand, testified that she never represented the children were his.  Instead, she claims Plaintiff simply assumed as much given their ongoing sexual relationship.  On this point, however, the Court does not find Defendant's version of events to be credible.  Plaintiff's testimony that Defendant told him that he was the father of the children is completely consistent with the documentary evidence admitted and how Plaintiff and Defendant acted.  Plaintiff believed the kids to be his until he learned otherwise, and the admission of text messages between the parties fully supports Plaintiff's story.  As an example, when Plaintiff was late once with his monthly payments, Defendant sent him the following text message: "I see you cut your kids off as well.  You said you would never do that because this has nothing to do with them.  It's to hurt me because you know I have to have the money to take care

of them…." Having considered all of the evidence and testimony, the Court finds that Plaintiff carried his burden of establishing that Defendant made false representations to him as to his paternity of both children.

### 2. Knowingly Made or Committed

With respect to the second element, Defendant asserts that she could not have knowingly made a false representation as to the children's paternity because she was having unprotected sex with multiple people during the times both children were conceived and did not know the paternity of either child. Beyond affirmative misrepresentations, however, fraud may arise from intentional silence or concealment of a material fact. *Robinson-Vinegar*, 561 B.R. at 566-67 (citing *FCC Nat'l Bank v. Gilmore (In re Gilmore)*, 221 B.R. 864, 872 (Bankr. N.D. Ala. 1998); *Duncan v. Bucciarelli (In re Bucciarelli),* 429 B.R. 372, 375-76 (Bankr. N.D. Ga. 2010)); s*ee also Hathaway*, 364 B.R. at 232 (finding that § 523(a)(2)(A) does not require an overt misrepresentation but such may be implied from the debtor's silence). Fraud and misrepresentation "may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor." *Hathaway*, 364 B.R. at 233 (citations omitted). Here, the testimony and evidence supports the conclusion that even if Defendant did not definitively know the paternity of her children, her representations to Plaintiff as to his paternity without further disclosure of the potential for other possibilities is sufficient to support a claim for fraud. Text messages between the two show that Defendant misled Plaintiff as to whether she had any ongoing relationships with other men. Defendant also intentionally concealed from Plaintiff the fact that her Second Husband was named the father on the birth certificates of both children. The text messages introduced at trial between Plaintiff and Defendant are replete with examples of Plaintiff referring to both kids as his children but contain no examples where Defendant ever sought to disabuse him of his belief

11

as to his paternity. By showing that Defendant was aware that Plaintiff believed the children to be his, coupled with Defendant's failure to disclose the potential for other fathers and her intentional concealment of material facts like who was named as the father on the birth certificates, Plaintiff satisfied his burden of proof as to the second element.

### 3. Intent to Deceive or Induce Acting on Same

With respect to the third element, because direct proof of intent is nearly impossible to obtain, such intent may be inferred from the surrounding circumstances. *Id.* at 235 (citing multiple cases). "An intent to deceive may be inferred from a false representation which the debtor should have known would induce a creditor." *Id.* (citing multiple cases). Where a debtor recklessly makes false representations that she should know will induce another to rely upon such false representations, intent to deceive may be inferred for purposes of § 523(a)(2)(A). *Id.* (citing multiple cases). Here, the totality of the evidence and the surrounding circumstances point clearly to the conclusion that Defendant intended to deceive Plaintiff into believing he was the father of both children so that he would continue making payments to her. Plaintiff has satisfied his burden of proof with respect to this element.

### 4. Justifiable Reliance

The fourth element requires that Plaintiff prove that he justifiably relied on Defendant's representations to recover under Section 523(a)(2)(A). *Field v. Mans*, 516 U.S. 59, 73-74, 116 S. Ct. 437, 446, 133 L.Ed.2d 351, 363(1995). Under this standard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71. In rejecting a reasonable reliance standard, the U.S. Supreme Court quoted extensively from the Restatement (Second) of Torts for the important point that justifiability is not without limits:

12

> a person is 'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by use of his senses.'

*Id*. (quoting Restatement (Second) of Torts § 541 cmt. a (1976)).

> [J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that '[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own.'

*Id*. (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)). Looking at this issue from Plaintiff's viewpoint, fully taking into account his individual qualities and characteristics, the Court cannot conclude that Plaintiff justifiably relied on any representations of Defendant as to his paternity.

The Court witnessed firsthand Plaintiff's prosecution of his case *pro se* at an all-day trial. Plaintiff did a remarkable job marshaling the facts and evidence and presenting his case in a compelling fashion without any prior training in the law and better than many of the lawyers that appear before the Court. Plaintiff's native language is not English, but the Court found Plaintiff to be articulate and in full command of the English language. Plaintiff is a bright and capable individual, and in answering the question of whether he justifiably relied on Defendant's representations, the Court must keep that in mind. Here, Plaintiff received ample warnings that he was being deceived that put him on notice of his need to investigate further. As Plaintiff admitted at trial, clues existed throughout the time that he was paying support for the benefit of the children

13

that he was not their father, and he testified that he feels guilty that he did not press on those clues. He also testified that he knew something was strange in the whole situation, but he trusted Defendant and did not ask for a paternity test. The strange facts that put Plaintiff on notice that something was amiss included, but were not limited to: (i) his inability to attend the births of either child; (ii) his lack of participation in naming either child; (iii) the infrequency with which he saw the children; (iv) his lack of knowledge as to where they resided; (v) his inability to get copies of birth certificates despite repeated requests for the same; and (vi) his suspicions as to whether Defendant was sexually involved with other men.

The simple answer is Plaintiff knew something was afoul, but he continued in the relationship notwithstanding the substantial clues that pointed to a different reality. Indeed, when he no longer could ignore his suspicions, he easily discovered a substantial body of facts calling Defendant's veracity into question almost instantly after he began investigating the situation. For a number of years, he blindly—not justifiably—relied on Defendant's representations to his detriment, and the law does not provide for a recovery under such circumstances.[6]

Plaintiff failed to carry his burden of proof on the element of justifiable reliance. Having failed to prove an essential element of his claim, the Court is compelled to enter judgment against Plaintiff and in favor of Defendant on Plaintiff's claim under § 523(a)(2)(A). In light of that result, no further analysis of Plaintiff's alleged damages or Defendant's unclean hands defense is necessary. The Court will now turn to Defendant's counterclaims.

---

[6] *See Grice v. Detwiler*, 227 Ga. App. 280, 488 S.E.2d 744 (1997) (finding putative father failed to show reasonable as opposed to justifiable reliance on any misrepresentations of mother where he was fully aware of questions regarding his paternity but failed to take any steps to conclusively resolve the issue); *Department of Human Resources v. Fenner*, 235 Ga. App. 233, 510 S.E.2d 534 (finding father failed to show reasonable reliance and proximate cause, which are essential elements of fraud, when he failed to investigate paternity issues despite suspicions).

### B. Defendant's Counterclaims for Fraud and Intentional Infliction of Emotional Distress

In addition to disputing any liability to Plaintiff, Defendant asserted two counterclaims against Plaintiff for fraud and intentional infliction of emotional distress. Defendant asserts essentially the same facts in support of both causes of action: she contends Plaintiff misrepresented his marital status at the outset of their relationship and seduced Defendant into a destructive eight-year relationship for which she suffered damages, including, but not limited to, having multiple abortions, severe anxiety, loss of self-esteem and diagnosed depression.

As an initial matter, the Court notes that at trial Defendant offered no evidence as to any actual damages suffered as a result of any conduct of Plaintiff, and that fact alone bars any recovery for Defendant on her counterclaims. Defendant also offered no evidence of severe anxiety, loss of self-esteem or diagnosed depression resulting from any conduct of Plaintiff. Even if she had, however, the facts of this case do not support a recovery for Defendant under either theory of liability.

#### 1. Fraud Counterclaim

Under Georgia law, much like the Bankruptcy Code, there are five elements that must be established to recover for the tort of fraud: (a) a false representation, (b) scienter, (c) intention to induce a party to act or refrain from acting, (d) justifiable reliance, and (e) damages. *Grizzle v. Guarantee Ins. Co.*, 602 F. Supp. 465, 467 (N.D. Ga. 1984); *Hardy v. Gordon,* 146 Ga. App. 656, 247 S.E.2d 166 (1978); *Shaw v. Cook County Fed. Savings & Loan,* 139 Ga. App. 419, 228 S.E.2d 326 (1976). Defendant bore the burden of proof of establishing her entitlement to relief on her fraud claim by a preponderance of the evidence. *Bloodworth v. Bloodworth*, 277 Ga. App. 387, 389, 626 S.E.2d 589, 591 (2006). In this case, the only false representations alleged at trial were Plaintiff's false representations at the outset of the relationship that he was not married and his

15

continuing representations after Defendant discovered he was married that he was going to leave his wife so that Plaintiff and Defendant could have a future together.  Neither presents a viable basis for a fraud claim.

First, while the evidence supports Defendant's allegation that Plaintiff misrepresented his marital status on his eHarmony.com profile and failed to disclose his marital status at the outset of their relationship, the evidence is also clear that Defendant knew as early as December of 2008 (within a few months of their meeting) that Plaintiff was married.  Notwithstanding such knowledge, she continued in an "on again, off again" relationship with Plaintiff for another seven plus years.  Defendant cannot establish that she justifiably relied on any representation or misrepresentation of Plaintiff, and as previously indicated, she offered no evidence of any damages she incurred that proximately resulted from such representations.

Similarly, any representations of Plaintiff that he was going to leave his wife to have a future with Defendant do not support a claim for fraud under Georgia law.

> The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future.  Nor does actionable fraud result from a mere failure to perform promises made.  Otherwise, any breach of a contract would amount to fraud.  An exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place.

*Buckley v. Turner Heritage Homes, Inc.*, 248 Ga. App. 793, 795, 347 S.E.2d 373, 376 (2001) (quoting *Bradley v. British Fitting Group*, 221 Ga. App. 621, 624, 472 S.E.2d 146, 151 (1996).  Any promises that Plaintiff made to Defendant relating to having a future together are not actionable unless Defendant established that Plaintiff made such promises with a present intent not to perform or knew that such future event would not occur.  Defendant presented no such evidence

16

at trial. Defendant failed to meet her burden of proof establishing a fraud claim against Plaintiff, and any relief to Defendant on that claim must be denied.

### 2. Intentional Infliction of Emotional Distress Counterclaim

Finally, the Court must address Defendant's counterclaim for intentional infliction of emotional distress. To prevail on a claim for intentional infliction of emotional distress under Georgia law, a party must demonstrate each of the following: (a) conduct giving rise to the claim was intentional or reckless, (b) the conduct was extreme and outrageous, (c) the conduct caused the emotional distress, and (d) the emotional distress was severe. *Ashman v. Marshall's of MA, Inc.*, 44 Ga. App. 228, 229–30, 535 S.E.2d 265, 267 (2000). As the Georgia courts have held:

> The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous, is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim "Outrageous!" Actionable conduct does not include insults, threats, indignities, annoyances, petty oppressions, or other vicissitudes of daily living but must go beyond all reasonable bounds of decency so as to be regarded as atrocious and utterly intolerable in a civilized community. Factors include the existence of a relationship in which one person has control over another, the actor's awareness of the victim's particular susceptibility, and the severity of the resultant harm. In all events, "major outrage in the language or conduct complained of is essential to the tort."

*Id.* (internal citations omitted). "Whether a claim arises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Odem v. Pace Academy*, 235 Ga. App. 648, 654, 510 S.E.2d 326, 332 (1998) (quoting *Taylor v. Gelfand*, 233 Ga. App. 835, 836, 505 S.E.2d 222, 224 (1998)); *Trimble v. Circuit City Stores*, 220 Ga. App. 498, 499, 469 S.E.2d 776, 778 (1996). As the Georgia courts have emphasized, the burden which a plaintiff must meet in order to prevail is a stringent one: "In order to sustain a cause of action in this state for the tort of intentional infliction of emotional distress, a plaintiff

17

must show that 'defendant's actions were so terrifying or insulting as naturally to humiliate, embarrass or frighten the plaintiff.'" *Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 229, 335 S.E.2d 445, 447 (1985) (quoting *Sossenko v. Michelin Tire Corp.*, 172 Ga. App. 771, 772, 324 S.E.2d 593, 594 (1984)). In this case, while the Court was prepared to scream "Outrageous!" after a full day of testimony from both parties, the Court cannot say that any conduct of Plaintiff was any more outrageous or egregious than any conduct of Defendant. The Court heard no evidence that Plaintiff had any form of control over Defendant in their relationship or that Defendant had any particular susceptibility of which Plaintiff was aware that would make further inquiry warranted. As previously indicated, Defendant offered no evidence of how she was harmed or suffered injury as a result of any conduct of Plaintiff. Defendant failed to carry her burden of proof with respect to her claim of intentional infliction of emotional distress, and the Court cannot award her any recovery on her claim.

For the foregoing reasons, the Court will enter judgment against Plaintiff and in favor of Defendant on Plaintiff's claim under Section 523(a)(2)(A), and the Court will enter judgment against Defendant and in favor of Plaintiff on Defendant's counterclaims for fraud and intentional infliction of emotional distress. The Court will enter a separate judgment consistent with this Memorandum Opinion.

**[END OF DOCUMENT]**